Mrs. Opal W. COVEY, Plaintiff,

v.

Anthony J. CELEBREZZE, Secretary, Department of Health, Education and Welfare, Defendant.

No. 14857-3.

United States District Court
W. D. Missouri, W. D.

Nov. 12, 1964.

---

Jack B. Robertson, of Rogers, Field & Gentry, Kansas City, Mo., for plaintiff.

F. Russell Millin, by Clifford M. Spottsville, Asst. U. S. Atty., Kansas City, Mo., for defendant.

DUNCAN, District Judge.

This is an appeal from a final decision of the Secretary of Health, Education and Welfare denying a period of disability and a disability allowance under the Social Security Act, (42 U.S.C.A. §§ 416 (i) and 423), to plaintiff, Opal W. Covey. Jurisdiction in this court is established by the provisions of 42 U.S.C.A. § 405 (g).

On August 29, 1962, plaintiff filed her application to establish a period of disability and for a disability allowance, alleging that she had been unable to work since February, 1956, due to neck and back injuries that were suffered as the result of an automobile accident.

Her application was denied. Her administrative remedies were finally exhausted on January 10, 1964, at which time the instant action was commenced.

Plaintiff is 46 years of age and has an eighth grade education. She lives with her second husband and 12 year old daughter at Excelsior Springs, Missouri. Plaintiff claims that she was disabled by a back injury received in an automobile accident on February 10, 1956, and has been unable to engage in substantial gainful activity since that time.

## WORK HISTORY

Plaintiff was born and raised on a farm in Arkansas, and engaged in various farm tasks, in the home. In 1941, she was employed as a kitchen helper (with some minor clerical duties) at Knott's Berry Farm in California. In 1942 she learned riveting at a trade school in California and went to work for Douglas Aircraft Company. There she was a riveter, taught riveting, was a lead lady and did tool crib work.

In 1945 she moved to Wichita, Kansas, and obtained employment with Boeing Aircraft, soldering wires on bombadier panels. Later in 1945 she moved to Portland, Oregon, and was employed at the Kaiser Shipyards, wiring ships. She could, at that time, read wiring blueprints.

In 1946, plaintiff moved to Bentonville, Arkansas, where she worked as a waitress, and then to Kansas City, Missouri, where she continued to work as a waitress at various restaurants until approximately 1949. In 1949–'50 she worked as a fry cook in the Kansas City area.

In 1950–'51, plaintiff worked as a packer in the Sunshine Biscuit Company factory in Kansas City. She packed cookies and candy by hand, and operated various machines that filled cookies, sealed bags, etc. These jobs required both sitting and standing.

In 1952, plaintiff did some part time work as a baby sitter. In 1953, she was a fry cook at a Kansas City restaurant. In 1954 for some time she worked at a cafe in an amusement park operation, and later was a fry cook at an Excelsior Springs, Missouri, hotel. In 1955, plaintiff sold photo enlargements on a commission basis (house to house). Plaintiff next worked for an indeterminate time in 1957 in a similar photo operation on a part time basis. She now makes velvet sofa pillows in the home, but states that her income would not be more than $75.00 per year from this endeavor.

## HEARING TESTIMONY

On February 10, 1956, plaintiff was driving an automobile when another automobile collided with the rear of her car. There was minor physical damage to the automobile. However, plaintiff stated that she "passed out in the wreck", and that her husband had to come and get her. The accident occurred on Friday, and on the following Monday plaintiff went to the offices of Drs. Robichaux and Sanders in Excelsior Springs, Missouri. X-rays were taken of her chest because of her complaints of pain in that area; no broken ribs were found.

In the next two days, however, she experienced "terrific" pain in her neck. She received treatment from her doctors, and was hospitalized the following week. She stated that there is always pain in her neck, that it gets stiff, and that this condition had been continuous from the accident to the date of the hearing. She stated that the pain was not "real bad", but was intensified by

using her arms over her head, and that she could not lift anything. She stated that she used salve, muscle relaxants and pain pills. She compared her pain with that of a bad toothache.

She stated that there were times when her neck got her down in bed and she was completely immobilized. She testified that she has headaches constantly.

Plaintiff stated that she began to have pain in her low back in 1958 at about the middle of the year. The pain was described as constant. Plaintiff testified that as of the time of the hearing, she could not remain standing for any length of time, nor could she remain seated, and she was only able to walk about one city block. She stated that in 1962 she had "bad trouble" with blood clots in her leg.

Plaintiff testified that her activities are quite limited; that she drives a car only on limited occasions and takes no long trips. She stated that she makes sofa pillows, but cannot work at it steadily because she must constantly change positions. She seldom visits and does no walking except around the house. She attends church when able. ("Maybe sometimes I can go all four Sundays and maybe the next month I'll go only twice.") She reads the Bible in the home with a group for one hour, one night a week. She does not attend any amusements except for an occasional drive-in movie. She does cook and bake for the family. She does no gardening, and the housework is principally done by her daughter. She stated that she can comb her hair and wash her feet, but cannot wash her back. She has great difficulty sleeping, reads some, watches T. V., but does not do the laundry. She testified that, in every three month period, she is down in bed from a week to a month.

George E. Sanders, M. D., who saw plaintiff following her injury, stated in his report, dated September 14, 1962, that on February 10, 1956, he diagnosed a whiplash injury with X-ray findings of subluxated cervical vertebra; that the patient was hospitalized, and that a cervical collar and Sonolater treatments were prescribed. He notes many office calls from February 10, 1956 to February 20, 1957.

Excelsior Springs Hospital records show that plaintiff was admitted on February 20, 1956, and discharged on March 4, 1956. Injuries indicated are whiplash and anxiety reaction. Treatment is listed as traction and neck brace.

Eugene B. Robichaux, M. D., in his report dated September 28, 1962, noted that plaintiff had not worked since February 1956. As of October, 1962, plaintiff's major complaints concerned her low back. He noted a back fusion and the removal of bone graft by Dr. Bolin. The report lists extreme lumbar tenderness and stiff neck as complaints.

The diagnosis was cervical arthritis, lumbar arthritis, post traumatic neurosis and anxiety reaction with hysteric and schizoid features. It is stated in the report that the plaintiff needs psychiatric therapy and less surgical interference. It was Dr. Robichaux's opinion that "restrictions on this patient's activities are many because of her mental attitude."

In a letter dated May 1, 1963, Dr. Robichaux enlarged his statement regarding the plaintiff. He stated that he attended the plaintiff from the date of the accident through November of 1958. He definitely stated that in his opinion, the plaintiff has been unable to engage in substantial gainful activity since the date of the accident on February 10, 1956.

In reviewing the plaintiff's medical history regarding the accident in question, Dr. Robichaux noted that she was hospitalized for the neck injury in February, 1956, and received continued treatment for a resulting somatic condition. By June of 1956, the psychiatric phase of the plaintiff's illness was apparent, and drugs and psychotherapy were instituted.

Plaintiff was urged to go to work as a therapeutic measure, and she did begin work in February, 1957, on a part time basis. She had major complaints and

was not on the job more than 2 to 3 hours a day. At this time she had severe symptoms referrable to the eyes, as well as a dermatitis which was diagnosed as neuro-dermatitis.

On March 3, 1957, plaintiff had a severe mental crisis. Dr. Robichaux had a long consultation with the plaintiff. He stated that she suffered from a severe psychiatric disturbance of the schizoid variety with even homicidal tendencies. He recommended institutional care; this recommendation was not accepted and medical therapy was instituted.

On May, 1957, plaintiff was sent to E. H. Trowbridge, M. D., a psychiatrist, for psychiatric evaluation. An anxiety reaction with hysterical and schizoid features was found. Dr. Robichaux believed that severe psychoneurosis bordering on psychosis was present.

In November, 1957, Robichaux noted that there was a recurrence of symptoms every four to eight weeks and anticipated that the condition would be permanent. Severe limitation was found in the neck. Based on findings in the plaintiff's neck and the psychiatric findings, Dr. Robichaux believed that the plaintiff was completely disabled, and that the work done in 1957 was not successful therapy.

In the report of Dr. E. H. Trowbridge dated June 3, 1957, he diagnosed plaintiff's problem as an anxiety reaction with hysteric and schizoid features. No active psychosis was found at that time, and no organic impairment. Dr. Trowbridge felt that the plaintiff's problem was not a result of the accident but was of long standing duration.

In psychological tests given at Dr. Trowbridge's request at the Neurological Hospital, Kansas City, Missouri, in June of 1957, there was a finding of mixed personality disorder, hysteric and schizoid features, with no intellectual deterioration.

Dr. J. C. Bolin, an osteopathic physician, submitted a report on September 11, 1962. This physician treated the plaintiff from October 27, 1960 to the date of the hearing for low back problems. Among surgical operations performed, Bolin indicates that he executed a complete laminectomy and spinal fusion, and that he removed a herniated disc, and also removed plaintiff's coccyx. A history taken at this doctor's request shows that the plaintiff's low back pain started after a hysterectomy which was performed in 1960. This history shows a nervous breakdown in 1951 as well as one in 1957.

An additional report from Dr. Bolin on February 9, 1963 states that plaintiff has nerve damage to the fourth lumbar nerve root which is irreversible. He states that plaintiff would be unable to sit, stoop or bend for any length of time. Muscular atrophy of lower extremity is noted. No mental findings are indicated.

H. B. Overesch, M. D., an orthopedic surgeon, gave the plaintiff a complete orthopedic examination in November 1962. He made no findings as to mental condition. His findings included chronic muscle spasm and atrophy of the cervical musculature. Back muscle atrophy was also noted, although there was no particular spasm in the low back.

X-rays indicated cervical malalignment and some narrowing of vertebral interspaces, as well as some bone spur formation. No evidence of fracture or dislocation was found in the cervical area. In the low back an unsuccessful bone graft was noted.

Dr. Overesch found disability in the cervical area, "both physical and organic, with considerable functional overlay present after this period of time." He noted that non-viable bone was to be removed from the low back in a subsequent operation. He stated that the plaintiff is disabled from performing any "heavy work, intricate fast work, or highly skilled work at this time", and that therapy would not be helpful.

The Hearing Examiner found that the plaintiff last met the earnings requirements of the Act in June of 1956; that her original problems were in the cervical area of the spine and that there was no low back complaint in 1956. He fur-

ther found that there was a mental problem in 1957, but that there was no intellectual deterioration, no gross disturbance in intellectual function, and no indication of active psychosis at that time. He also considered plaintiff's low back difficulties and the spinal fusion operation of 1961–'62.

The examiner further found that Dr. Overesch's examination of the plaintiff on November 3, 1962, was very complete and that the doctor found only that plaintiff was disabled from performing any heavy, intricate, fast or highly skilled work.

The examiner found that mental problems have always been a factor in the plaintiff's disabilities, and that the plaintiff had had little, if any, treatment for that condition.

Based on these facts, the examiner found that plaintiff had a past work history which included jobs that would be compatible with plaintiff's physical difficulties, as late as 1962. He found that her mental problems were not such as would "impair the effectiveness or predictability of her behavior, which would be incompatible with occupational activities". He noted her apparent rationality at the hearing. The examiner specifically noted that the cookie packing job which the plaintiff had engaged in in the past was within her impaired capabilities.

The examiner concluded that the plaintiff had not established that she had either a singular, or combined impairment which would preclude her from substantial gainful activity from the time of her last compliance with the earnings requirements to the date when her application was filed.

## OPINION

This court's jurisdiction is established as well as limited in scope by the provisions of § 405(g) of Title 42 U.S.C.A.:

"The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *."

"Disability" under the statute is defined in §§ 416(i) and 423(c) (2) of Title 42 U.S.C.A.:

"[I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration * * *."

█ The burden of proving that disability exists is clearly upon the plaintiff. § 423(c) (2) Title 42 U.S.C.A. See also, Roberts v. Flemming, 187 F.Supp. 649 (W.D.Mo.1960), Poage v. Ribicoff, 205 F.Supp. 938 (E.D.Mo.1962).

The Act requires that the individual seeking a disability allowance have twenty quarters of coverage in the forty quarter period ending with the first quarter of disability, in order to establish insured status. There is apparently no dispute that the plaintiff last met this requirement in the second quarter of 1956. Her disability must have been such that she was unable to engage in substantial gainful activity from June 30, 1956, until August 29, 1962, and the burden of proving such disability is upon her.

Under § 405(g) above quoted, the decision of the hearing examiner is conclusive, unless this court finds that his decision was not supported by substantial evidence. The Supreme Court has stated:

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. of New York v. N. L. R. B., 305 U.S. 197, 220, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).

Further:

"[Substantial evidence is] * * enough to justify, if the trial were.

to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." N. L. R. B. v. Columbian Enameling and Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939).

■■ This court then, must decide, in light of the foregoing, whether or not the examiner's decision denying the plaintiff an allowance was based on substantial evidence. If so, that decision must be affirmed. In doing this, the court does not surrender its conventional judicial function, but passes upon the reasonableness of the examiner's findings in the light of the entire record. See Ellerman v. Flemming, 188 F.Supp. 521 (W.D.Mo.1960).

The hearing examiner's decision in this case appears to be simply a holding that the plaintiff has failed to sustain the burden of proof required of her. The record consists wholly of doctors' reports and the plaintiff's testimony. No witnesses appeared other than the plaintiff herself.

Dr. Robichaux, an M. D., treated the plaintiff from early in 1956 to late 1957, and it was his opinion that the plaintiff was totally disabled. His diagnosis was based on her neck injury and mental problems, but it is quite obvious from a reading of his reports that the real basis of his finding is his feeling that the plaintiff has a serious psychiatric illness, (See Tr. p. 134) especially in view of his statement that the plaintiff recovered from her initial neck injury.

Dr. E. H. Trowbridge, a psychiatrist, found that plaintiff's mental problems were of long standing duration, rather than post-traumatic, as diagnosed by Dr. Robichaux. He found an anxiety reaction with hysteric and schizoid features, however, he found no active psychosis. Psychological tests ordered by Dr. Trowbridge revealed no intellectual deterioration and no gross disturbance in intellectual functioning.

The record reveals no evidence of any treatment related to disability between November 22, 1957, when Dr. Robichaux's treatment was terminated, and October 27, 1960, when Dr. Bolin's treatment for plaintiff's low back problems commenced.

The plaintiff's psychiatric illness is certainly established by the record, and is definitely a factor in this matter. However, it is to be noted that the plaintiff herself does not, anywhere in the record, urge her mental problems as a basis of disability.

Neither her testimony, nor any of her applications makes any mention of her mental disease. Her complaints are in the physical vein exclusively, and the treatment which she sought was exclusively orthopedic in nature. The examiner found her well orientated, rational, and responsive at the hearing.

There is certainly substantial evidence in the record to support a conclusion that plaintiff's neck injury alone would not preclude her from engaging in substantial gainful activity. Even in 1962, when taken in concert with her low back injury, Dr. Overesch found that plaintiff was merely limited in her activities rather than completely disabled.

The record justifies conclusions that plaintiff's neck injury was not disabling within the meaning of the Act; and that plaintiff's mental problems were in existence at the time of the accident in 1956. Plaintiff had been engaged in gainful activity until the accident.

■ The crucial period in this matter appears to be 1956–'60. If the claimant met the earnings requirements as late as 1960–1962, this court would have difficulty in finding substantial evidence in the record to support a denial of disability. The fact remains however, that the plaintiff last met the earnings requirements in 1956, and that she had the burden of showing disability from 1956–1962.

Dr. Robichaux stated quite unequivocally that the plaintiff was totally disabled from engaging in substantial gainful activity from 1956–'62. He is the only physician so testifying.

The question of disability is not ordinarily to be determined by the opinion evidence of experts. Domann v. Secretary of H. E. W., 220 F.Supp. 252 (W.D.Mo.1963), although if such evidence is *uncontroverted*, a decision to the contrary must be set aside as speculative. Kohrs v. Flemming, 272 F.2d 731 (8th Cir. 1959).

In this case however, the opinion evidence is not totally in accord. Dr. Trowbridge, the psychiatrist to whom Dr. Robichaux referred the plaintiff, was of the opinion that plaintiff's illness was of long standing duration, and not post-traumatic. His report also indicates a mental illness of less seriousness than that indicated by Robichaux.

(Trowbridge's opinion as to the length of plaintiff's illness is substantiated by her pre-operative history indicating a breakdown in 1951. However, the examiner seems to have overlooked this matter, and it is therefore outside this court's scope of review.) As far as physical difficulties, the reports of Bolin and Overesch, *which include consideration of plaintiff's serious low back condition*, still do not consider plaintiff as disabled from *any* activity, but are framed in terms of limitation of activity.

Also to be considered is the remark of Dr. Robichaux in his letter of May 1, 1963, that the plaintiff had suffered a neck injury, "from which she had recovered".

The lack of any evidence of treatment from 1958 through 1960 would justify an inference that plaintiff's mental illness had not worsened or even remained at a level requiring the medical therapy which she had previously been receiving. Of course, a disability, once established, is presumed to continue in the absence of proof to the contrary. Hall v. Celebrezze, 314 F.2d 686 (6th Cir. 1963), but here, in view of the conflicting opinions, a disability can hardly be said to have been established.

Suffice it to say that there is substantial evidence in the record to support a decision that plaintiff was not disabled within the meaning of the Act for the total period 1956–'62. At the very least, there is support for the negative proposition that plaintiff did not meet the required burden of proving that she was disabled, when her extensive and varied employment background is taken in conjunction with the inconsistent opinion testimony and sheer lack of proof that appears on the face of the record.

The decision of the Secretary, denying the plaintiff's application for the establishment of a period of disability and a disability allowance, is therefore affirmed. It is so ordered.